IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

OMARRIAN JONES,

      **Plaintiff,**

v.

WEXFORD HEALTH SOURCES, INC.,
JACOB WEATHERFORD,
DR. CHRISTINA FLOREANI,
MEGAN VANPELT,
ROB JEFFREYS,
DR. EVA LEVEN,
ANTHONY WILLS, and
LEE GREGSON,

      **Defendants.**

Case No. 19-cv-386-NJR

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Pending before the Court are Motions for Summary Judgment filed by Defendants Lee Gregson, Rob Jeffreys, and Anthony Wills ("IDOC Defendants") (Doc. 148)[1] and Defendants Wexford Health Sources, Inc., Jacob Weatherford, Dr. Christina Floreani, Megan VanPelt, and Dr. Eva Leven ("Wexford Defendants"). (Doc. 153). For the reasons set forth below, the motions are granted in part and denied in part.

### FACTUAL BACKGROUND

Plaintiff Omarrian Jones, who goes by the name I.M.,[2] is an inmate of the Illinois Department of Corrections ("IDOC") and was previously housed at Menard Correctional

---

[1] The Court granted I.M.'s Motion to Substitute Party. Thus, Lee Gregson was substituted for Jane Doe, and I.M. proceeded on two counts against Lee Gregson and one count against Rob Jeffreys. (Docs 34, 102).
[2] The Court refers to I.M. with gender neutral pronouns, as that is I.M.'s preference.

Center ("Menard").[3] I.M. alleges a history of mental illness, depression, and ADHD resulting in a prior classification as Seriously Mentally Ill ("SMI"), which was later removed. (Doc. 103, pp. 5, 10). I.M. claims that, while at Menard, I.M. was not being properly medicated for mental health issues and, therefore, I.M.'s condition deteriorated, I.M. became severely clinically and chronically depressed, and I.M. began expressing suicidal ideology. (*Id.* at p. 5).

On August 30, 2018, between 3:00 p.m. and 11:00 p.m., I.M. attempted to hang themself. (Doc. 149, p. 3). I.M.'s cellmate came back from work and took a noose away from I.M. (*Id.*). I.M.'s cellmate gave the noose to the nurse working on the second shift. (*Id.*). I.M. did not know the identity of this nurse. (*Id.*).

On August 31, 2018, during the third shift at around 2:00 a.m., I.M. gave a different nurse a note reporting I.M.'s suicidal thoughts. (*Id.*). I.M. was removed from the cell for evaluation within 30 minutes of giving the second nurse working the third shift the note. (*Id.*). I.M. did not know the identity of the nurse working the third shift. (*Id.*). I.M. testified that the nurse working the second shift was not the same nurse who was working the third shift who I.M. talked to again when I.M. was evaluated in the early morning of August 31, 2018. (*Id.*). I.M. testified that they had no issues with the treatment provided by the nurse who performed the evaluation while working the third shift. (*Id.*). I.M. believes a nurse needs to obtain a doctor's approval before an offender can be placed on crisis watch. (*Id.*)

---

[3] I.M. entered IDOC custody in 2012. They are currently housed at Joliet Treatment Center. https://www2.illinois.gov/idoc/Offender/Pages/InmateSearch.aspx (last visited Sept. 25, 2023).

Defendant Gregson was the nurse working the third shift. (*Id*. at p. 4). Gregson prepared an Incident Report on August 31, 2018, at 2:15 a.m., "indicating that [I.M.] was brought to the Health Care Unit ('HCU') by security with a note stating that they wanted to commit suicide." (*Id*.). Gregson filled out an Evaluation of Suicide Potential Form and called Dr. Goldman. Following the evaluation, I.M. was placed on crisis watch with 15-minute Close Supervision. (*Id.*).

I.M. alleges that their cell in crisis watch constituted an unconstitutional condition of confinement. (Doc. 103, pp. 20-22). I.M. stayed in Cell 509 from August 31, 2018, until September 5, 2018. (*Id.* at 6-7). I.M. testified that the cell was never cleaned, had defecation on the walls, blood on the mattress, and was so hot that one couldn't breathe properly. (Doc. 154-1, pp. 20-21). I.M. indicated Dr. Leven visited them while I.M. was housed in this cell. There is a record of a conversation between the two on October 3, 2018, which is when I.M. was housed in Cell 503. (*Id*. at 38. 154-6, p. 38). I.M. also testified that they had educated VanPelt and MHP Weatherford about the cell conditions. (Doc. 154-1, pp. 22, 35-36,38). I.M. was then housed in Cell 503 from September 14, 2018, until October 26, 2018. (Doc. 103, p. 7). I.M. testified this move occurred because I.M.'s neighbors died.[4] (Doc. 154-1, p. 34). I.M. reported that Cell 503 was also filthy, smelled of urine, and had defecation on the walls like in Cell 509. (*Id.* at 34, 43). I.M. testified that Cell 509 only had hot water, and Cell 503 only had cold water. (*Id.* at 42). I.M. indicates that VanPelt, Weatherford, and Leven were all aware of the conditions in Cell 503 as well. (*Id.* at 39-

---

[4] It is an undisputed fact that the three inmates who died while staying in Crisis Watch died from "probable intoxication with unknown substances" that is suspected to be a synthetic cannabinoid. (Doc. 159, p. 7).

40). Originally, I.M. was transferred out of Cell 503 prior to their suicide attempt on September 19, 2018. I.M. was then returned to Cell 503, where I.M. stayed until I.M. was moved to the Healthcare unit prior I.M.'s transfer to Dixon at the end of October. (*Id.* at 41-2).

From August 31, 2018, through the morning of September 12, 2018, I.M. was cooperative with mental health staff at Menard and made no attempts at self-harm. (Doc. 159, p. 3). While in crisis watch, I.M. explained I.M. wanted to meet with a psychiatrist to be prescribed Adderall. (*Id.*).

On September 12, 2018, I.M. met with mental health staff, including Dr. Glenn—a psychiatrist—to determine whether I.M. could be released from crisis watch. (*Id.*). During this meeting, I.M. explained that I.M. had kept I.M.'s word by not hurting themself while on crisis watch. (*Id.*). I.M. also stated that I.M. waited "a long time" to speak with a psychiatrist and asked to be discharged due to not feeling suicidal. (*Id.*). I.M. still sought the prescription of medication for ADHD, however, and began threatening self-harm again following the denial of this request. (*Id.* at p. 4). I.M. refused to consent to treatment with anything other than Adderall or Wellbutrin. (Doc. 154, p.3). Dr. Glenn determined that a psychostimulant such as Adderall was not indicated because I.M. was not in an educational or workplace setting. (*Id.*). Thus, Dr. Glenn prescribed Wellbutrin. (*Id.*).

On September 19, 2018, I.M. met with medical staff, including Defendants Floreani and Weatherford, to determine whether I.M. could be released from crisis watch. (*Id.*). Again, I.M. threatened self-harm. (*Id.* at p. 5). Despite these threats, the assessment resulted in I.M.'s release from crisis watch. (Doc. 154-6, p. 301).

That same day, a correctional officer reported seeing I.M. with an item around I.M.'s neck. I.M was taken to health care. (Doc. 154-6, p. 301). Medical staff noted no trauma to the neck. (*Id*. at p. 390). But I.M. testified that when I.M. looks up, I.M. endures "the most agonizing pain." (Doc. 154-1, p. 117). Nonetheless, I.M. refused a second medical assessment at that time. (Doc. 154, p. 4).

I.M. was then returned to crisis watch but refused to be evaluated for suicide potential. (Doc. 159, p. 6). I.M. "continued to express the need for ADHD medication after attempting suicide following Defendants' refusal to prescribe ADHD medication." (*Id*. at p. 7). Following the alleged suicide attempt on September 19, 2018, Dr. Floreani did prescribe Zyprexa and one-time doses of additional medications. (Doc. 154, p. 4).

Following these incidents, I.M. testified that "anybody can get mental health treatment, whether or not the person is classified as SMI." (Doc. 149, p. 4). I.M. also conceded that I.M. was not discriminated against within the context of any policies or programs and that I.M. had a job while at Menard. (*Id*.). Additionally, the undisputed material facts show that Defendant VanPelt has no authority over inmate housing. (Doc. 159, p. 7).

I.M. filed the Complaint in this matter on April 8, 2019.[5] (Doc. 1). The Second Amended Complaint was filed on September 17, 2019 (Doc. 33) and the Third Amended Complaint on November 16, 2020 (Doc. 103). Following the Court's Order for Service of

---

[5] Along with his Complaint, I.M. filed a one page document seeking leave to amend the Complaint (*see* Doc. 11), and the Court considered both documents in its initial screening. Because I.M's *pro se* filings were incoherent and convoluted, the Court assigned counsel to I.M. early in the case to evaluate I.M.'s claims and amend the complaint. (Doc. 14). Counsel entered an appearance in April 2019. (Docs. 23, 24).

Process (Doc. 34), the following nine counts remain in this case:

| | |
|---|---|
| Count I: | Eighth Amendment claim against Lee Gregson for failure to protect and deliberate indifference to Plaintiff's risk of suicide on August 30, 2018. |
| Count II: | Eighth Amendment claim against Dr. Floreani and Weatherford for failure to protect and deliberate indifference to Plaintiff's risk of suicide on September 19, 2018. |
| Count III: | Eighth Amendment claim against Dr. Leven for subjecting Plaintiff to unconstitutional conditions of confinement while on crisis watch in cell 509 from August 31, 2018, until September 5, 2018, and in cell 503 from September 14, 2018, until October 26, 2018. |
| Count V: | Violation of the Americans with Disabilities Act and Rehabilitation Act claim against Jeffreys, in his official capacity. |
| Count VI: | Eighth Amendment claim against VanPelt for failing to protect Plaintiff from himself, prison staff, medical providers, and other inmates. |
| Count VIII: | Eighth Amendment claim against Dr. Floreani, Weatherford, Dr. Leven, and Wexford for exhibiting deliberate indifference to Plaintiff's serious medical needs regarding treatment for his mental illnesses and related injuries while at Menard. |
| Count IX: | First Amendment claim against Dr. Floreani for retaliating against Plaintiff by changing his diagnosis and medication. |
| Count XI: | Intentional infliction of emotional distress claim in violation of Illinois state law against Wexford, VanPelt, Weatherford, Dr. Floreani, Lee Gregson, and Dr. Leven. |

(Doc. 34, p. 20).[6]

---

[6] Defendant Wills, the warden of Menard, was to "remain a party, in his official capacity only, and [was] [ ] responsible for responding to discovery aimed at identifying this unknown defendant and implementing

Defendants have moved for summary judgment on all surviving claims. (Docs. 148, 153).

## LEGAL STANDARD

Summary judgment is only appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014) (quoting FED. R. CIV. P. 56(a)). Once the moving party sets forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 232-24 (1986). The nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts," to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[i]nferences that rely upon speculation or conjecture are insufficient." *Armato v. Grounds*, 766 F.3d 713, 719 (7th Cir. 2014). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* (citation omitted).

---

any potential order for injunctive relief." (Doc. 34, p. 19; Doc. 101). The Court dismisses Wills because there are no longer unknown defendants, and I.M. is no longer housed at Menard.

Pursuant to this Court's Local Rules, when a party fails to respond to a motion, the Court may use its discretion in determining whether this is an admission of the merits of the motion. SDIL-LR 7.1(c); *see also* FED. R. CIV. P. 56(e)(3) (stating that when a party fails to properly address another party's assertion of facts the Court may grant summary judgment if the motion and supporting materials indicate that the movant is entitled to it). While failure to respond alone is not enough to grant a motion for summary judgment, it is proper when the undisputed facts resulting from a failure to respond support granting the motion, even when taken in the light most favorable to the nonmoving party. *Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021).

**DISCUSSION**

**I.      Motion for Summary Judgment by Defendants Lee Gregson, Rob Jeffreys, and Anthony Wills (Doc. 148)**

From the outset, the Court finds that each of the 18 material facts provided by the IDOC Defendants in their memorandum in support of summary judgment are undisputed. On February 1, 2023, Defendants filed their Motion for Summary Judgment. (Doc. 148). After three months without a response, the Court ordered I.M.'s counsel to "show cause, on or before May 15, 2023, why the Court should not construe [I.M.'s] failure to timely respond to the motion for summary judgment as an admission of the merits of the motion and grant summary judgment for Defendants." (Doc. 156). Counsel was "warned that the failure to file either a response to this Order to Show Cause or a response to the pending motion for summary judgment may result in the dismissal of Defendants for lack of prosecution pursuant to Federal Rule of Civil Procedure 41(b) and

the Court's inherent authority to manage its docket." (*Id.*). I.M.'s counsel responded to the show cause order requesting the Court to not dismiss the action and allow counsel seven days to submit its response to Defendants' Motions for Summary Judgment. The Court granted I.M.'s counsel seven days to submit its response to Defendants' Motions for Summary Judgment (Docs. 148, 153).

I.M.'s counsel never responded to the IDOC Defendants' Motion for Summary Judgment. As a result, under Federal Rule of Civil Procedure 56(e), the Court will use its discretion and deem each of the 18 material facts undisputed. *See e.g., Xavier v. Myers*, 2020 WL 5095242, at *2 (S.D. Ill. Aug. 28, 2020) ("The Court deems all material facts undisputed because Plaintiff failed to file a response to the pending motion for summary judgment by the original deadline (April 20, 2020) or extended (July 6, 2020) deadline.").

### A. Count I – Eighth Amendment Failure to Protect Claim Against Gregson

Turning to I.M's deliberate indifference claim against Gregson, I.M. contends that Gregson failed to protect I.M. from the risk of suicide on August 30, 2018. Gregson argues that "[b]ased on the records in this case, it is clear that Defendant Gregson was the nurse who evaluated Plaintiff in the early morning of August 31, 2018, not the nurse who allegedly received a makeshift noose from Plaintiff's cellmate on August 30, 2018." (Doc. 149, p. 7). Gregson argues that "[n]ot only is it clear that Defendant Gregson was not the nurse who allegedly ignored a risk to Plaintiff's safety, but further that Defendant Gregson did everything within her power to attempt to protect Plaintiff from the risk they posed to themselves." (*Id.*). Based on the undisputed material facts, the Court agrees. Gregson is entitled to summary judgment with respect to Count I.

B.  *Count V – Violation of the Americans with Disabilities Act and Rehabilitation Act Against Jeffreys*

"To state a claim under the ADA and the Rehabilitation Act, a plaintiff must allege that: (1) he is a qualified individual with a disability; (2) he was denied the benefits of the 'services, programs, or activities of a public entity;' (3) he was denied those benefits or otherwise discriminated against on account of his disability, and for the Rehabilitation Act claim, the additional requirement is that (4) the defendant is an entity which receives federal funds." *Scott v. Jeffreys*, 2022 WL 2715802, at *2 (N.D. Ill. July 13, 2022) (citing *Clemons v. Dart*, 168 F. Supp. 3d 1060, 1065 (N.D. Ill. 2016)). The "relief available to [I.M.] under these provisions is coextensive." *Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 671 (7th Cir. 2012).

The word "and" is not in the definition of "disability." Rather, "[a] qualified individual with a disability is someone who has 'a physical or mental impairment that substantially limits one or more of his major life activities,' has 'a record of such an impairment,' **or** is 'being regarded as having such an impairment.'" *Bowers v. Dart*, 1 F.4th 513, 519–20 (7th Cir. 2021) (quoting 42 U.S.C. §12102(1)) (emphasis added).

Here, I.M. alleges that I.M. is a "qualified person with mental disability under the ADA and RA and [their] disability is known to defendants." (Doc. 103, p. 23). I.M. alleges that "Defendants [ ] violated the ADA and RA by the retaliatory decision to classify [I.M.] as non-SMI for a short time following [I.M.'s] September 19, 2018 attempted suicide." (*Id.* at p. 24). The problem is I.M. "testified that anybody can get mental health treatment, whether or not the person is classified as [SMI]." (*Id.* at p. 4) (citing Doc. 154-1, p. 113).

I.M. was also "not discriminated against as 'far as any policies or programs' and had a job while incarcerated at Menard." (*Id.*) (citing Doc. 154-1, p. 115).

Accordingly, Jeffreys is entitled to summary judgment with respect to Count V.

### C.  Count XI – Intentional Infliction of Emotional Distress Against Gregson

I.M. claims that Gregson's conduct was extreme and outrageous. (Doc. 103, p. 28). The undisputed material facts, however, show that "Defendant Gregson was not the nurse who allegedly ignored a risk to Plaintiff's safety, but further that Defendant Gregson did everything within her power to attempt to protect Plaintiff from the risk they posed to themselves." (Doc. 149, p. 7) (citing Doc. 149-2, p. 1; Doc. 149-3, pp. 38-39; Doc. 154-1, pp. 105-110). Thus, there is nothing extreme or outrageous about Gregson's conduct, and she is granted summary judgment with respect to Count XI.

## II. Motion for Summary Judgment by Wexford Defendants (Doc. 153)

From the outset, the Court notes that I.M. only responded to the arguments made for Summary Judgment on Count II and did not respond to any of the other arguments made in the Motion for Summary Judgment by the Wexford Defendants (Doc. 153). (Doc. 159). As a result, under Federal Rule of Civil Procedure 56(e), the Court will use its discretion and deem any of the non-addressed material facts as undisputed. *See e.g., Xavier,* 2020 WL 5095242, at *2.

### A.  Count II – Eighth Amendment Claim against Dr. Floreani and Weatherford for Failure to Protect Against I.M.'s Risk of Suicide on September 19, 2018

I.M. claims that Dr. Floreani and Weatherford failed to protect I.M. from I.M.'s risk of suicide on September 19, 2018. An Eighth Amendment failure to protect claim requires

a two-part analysis. *Brown v. Budz*, 398 F.3d 904, 909 (7th Cir. 2005). I.M. must show that I.M. "is incarcerated under conditions posing a substantial risk of serious harm," and (2) defendant-officials acted with 'deliberate indifference' to that risk." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A risk of suicide, like that at issue here, qualifies as a substantial risk of serious harm, and, therefore, I.M. "ha[s]the right to be free from deliberate indifference to this risk." *Lisle v. Welborn,* 933 F.3d 705, 716 (7th Cir. 2019).

To prevail, I.M also must prove that Defendants acted with deliberate indifference to I.M.'s risk of suicide. *Brown*, 398 F.3d at 909; *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (quoting *Farmer*, 511 U.S. at 834). This is a subjective inquiry into a prison official's state of mind that requires an inmate to show that the defendant "(1) subjectively knew the prisoner was at substantial risk of committing suicide and (2) intentionally disregarded the risk." *Lisle*, 933 F.3d at 716-17 (quoting *Collins v. Seeman*, 462 F.3d 757, 761 (7th Cir. 2006)); *Petties*, 836 F.3d at 728.

When a medical professional makes a reasoned decision to remove an inmate from clinical observation based on their professional judgment, this decision must be afforded deference and does not qualify as knowingly or unreasonably failing to respond to a risk of harm unless there is evidence that this opinion is a "substantial departure from accepted professional judgment." *Connor v. Rubin-Asch*, 793 F. App'x. 427, 430 (7th Cir. 2019) (finding that a reasonable jury could not find that a doctor had acted with deliberate indifference when he had exercised his professional judgment and released an inmate from crisis watch, despite threats of self-harm, based on his opinion that the threats were not genuine). Further, non-doctors, such as correctional officers or other prison staff, are

entitled to rely on the professional judgment of doctors, particularly when they have no authority to override that judgment. *Id.* at 430-31.

I.M. alleges that Dr. Floreani and MHP Weatherford acted with deliberate indifference when they discharged I.M from crisis watch on September 19, 2018. (Doc. 103, pg. 18-19). But the undisputed facts do not support a claim of deliberate indifference. As a medical professional, any decision Dr. Floreani made pursuant to her professional judgment is subject to substantial deference and can only qualify as deliberately indifferent behavior if it is shown to be a substantial departure from accepted professional judgment norms. *Connor*, 793 F. App'x. at 430. It is undisputed that Dr. Floreani and Weatherford met with I.M on September 19, 2018, to assess whether I.M was fit to be discharged from crisis watch. (Doc. 159, p. 4). It is also undisputed that I.M. threatened self-harm at that meeting, and that Dr. Floreani, after assessing the situation and medical history of the patient with Weatherford, exercised her professional judgment in deciding that I.M. could still be released from crisis watch. (*Id.* at p. 5). I.M. only argues that Defendants abused their professional judgment. (*Id.*)

Even when viewing the record in the light most favorable to I.M., the heightened threshold for deliberate indifference by a medical professional exerting their professional judgment is not met. The medical records indicate that I.M. had been kept on crisis watch since August 31, 2018, and that I.M. had not exhibited any self-harming behaviors during that time. (Doc. 154-6, p.13). Following their assessment, Dr. Floreani and Weatherford indicated that I.M. was hostile, uncooperative, and presented as utilizing crisis watch to try and obtain medication. (*Id.*) After this joint consultation, Dr. Floreani exercised her

professional judgment and determined that release was appropriate at that time. (*Id.*; Doc. 154-2, p. 57-59).

I.M fails to provide any support for the idea that the decision made by Dr. Floreani to release I.M. from crisis watch was a substantial departure from accepted professional judgment norms. In fact, the evidence indicates that multiple medical professionals agreed. When I.M. was evaluated at Dixon Correctional Center on March 16, 2019, another doctor concluded that, in his professional opinion, I.M. was exhibiting drug-seeking behavior and exaggerating I.M.'s depression symptoms in order to try and obtain Adderall. (Doc. 154-6, p.4).

Finally, Weatherford had no authority or control over when I.M. was discharged from crisis watch (Doc. 154-3, p. 2), and, therefore, cannot be found to have acted with deliberate indifference to I.M.'s risk of suicide. *See Connor*, 793 F. App'x. at 430-31 (finding that non-doctors are entitled to rely on the professional judgment of doctors, particularly when they lack authority to override the doctor's assessment).

Thus, Dr. Floreani and Weatherford are granted summary judgment with respect to Count II.

> **B.** *Count III – Eighth Amendment Claim for Unconstitutional Conditions of Confinement Against Dr. Leven*

The Eighth Amendment places a duty on prison officials to provide prisoners "humane conditions of confinement." *Farmer*, 511 U.S. at 832. This means that prison officials must "take reasonable measures to guarantee the safety of the inmates" and "ensure that inmates receive adequate food, clothing, shelter and medical care." *Id*. Prison

officials have a responsibility to provide prisoners, at a minimum, with the necessities of civilized life including shelter, sanitation, and utilities. *Johnson v. Pelker*, 891 F.2d 136, 139 (7th Cir. 1989).

As discussed previously, a prisoner plaintiff needs to establish two elements to succeed on an Eighth Amendment claim for deliberate indifference to a substantial risk of serious harm. The first is an objective component requiring that the deprivation or conditions of confinement alleged are "sufficiently serious" to result in the denial of "the minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834. Generally, the prisoner plaintiff must show that he is or was "incarcerated under conditions posing a substantial risk of serious harm" to his health or safety. *Id*. The second element is a subjective component, which requires the prisoner plaintiff to establish that the defendants were "deliberately indifferent" to the unlawful conditions of confinement. *Id*.

In conditions of confinement cases, the relevant state of mind is deliberate indifference to an inmate's health or safety; the official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he also must draw the inference. *Id*. at 839. This subjective state of mind component is akin to intentional or criminally reckless conduct. *Salazar v. City of Chicago*, 940 F.2d 233, 238 (7th Cir. 1991); *Rivera v. Gupta*, 836 F.3d 839, 842 (7th Cir. 2016). "There is no liability under the Cruel and Unusual Punishments Clause if a prison official has responded reasonably to a risk of harm." *Doe v. Welborn*, 110 F.3d 520, 524 (7th Cir. 1997) (citing *Farmer,* 511 U.S. at 844 ("prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm

ultimately was not averted.")).

I.M. alleges that Dr. Leven subjected I.M. to unconstitutional conditions of confinement while on crisis watch in cell 509 from August 31, 2018, until September 5, 2018, and in cell 503 from September 14, 2018, until October 26, 2018. Dr. Leven argues that I.M. "provides no actual evidence regarding the conditions of [I.M.'s] cell, or that conditions were so bad that three inmates died." (Doc. 154, p. 12). Dr. Leven also notes she "was responsible for supervising clinicians who treated inmates on crisis watch and was not typically present at an inmate's cell-front because she was not the inmate's treating provider." (Doc. 154, p. 12) (citing Doc. 154-5, pp. 14-15). But Dr. Leven also stated that "a big part of the job" performing crisis watch management was making sure that conditions of the cells were humane. (Doc. 154-5, p. 6).

Thus, the evidence, when viewed in the light most favorable to I.M., establishes a factual dispute about whether Dr. Leven was deliberately indifferent to I.M.'s conditions of confinement. As to the objective prong, I.M. explained cell 503 had defecation and urine, and cell 509 was filthy, hot, and had defecation (Doc. 154-1, pp. 21, 34, 36, 40). As to the subjective prong, I.M. stated that I.M. talked to Dr. Leven while in crisis watch. I.M. explained that I.M. told Dr. Leven about the cell conditions in 509. (*Id*. at pp. 35-37). Besides I.M.'s deposition testimony, there is evidence of a conversation between I.M. and Dr. Leven that took place on October 3, 2018, while I.M. would have been in cell 503. (Doc. 154-6, p. 38). If I.M. did report the conditions of his cell to Dr. Leven as is currently disputed, Dr. Leven herself has indicated that it would have been her responsibility to ensure that the conditions of the cell were rectified. For these reasons, summary judgment

must be denied as to Count III against Dr. Leven.

  C. *Count VI – Eighth Amendment Claim for Failing to Protect I.M. Against VanPelt*

  I.M. alleges that I.M. made a request to VanPelt to be placed into a single cell, but continued to be celled with inmates who threatened I.M.'s safety. (Doc. 103, pp. 6, 15). I.M. later explained, however, that between August 31, 2018, and when I.M. left Menard, I.M. never had a cellmate. (Doc. 154-1, pp. 84-85). Also, the undisputed material facts show VanPelt had no authority to determine I.M.'s housing arrangements. Accordingly, Defendant VanPelt is granted summary judgment with respect to Count VI.

  D. *Count VIII – Eight Amendment Claim for Deliberate Indifference Against Dr. Floreani, Weatherford, Dr. Leven, and Wexford*

  Deliberate indifference to serious medical needs of inmates may constitute cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). As in a failure to protect claim, deliberate indifference requires (1) that an inmate suffer from an "objectively serious medical condition" (2) to which a prison official was then "deliberately, that is subjectively, indifferent, towards*." Whiting v. Wexford Health Sources, Inc.,* 839 F.3d 658, 622 (7th Cir. 2008) (citation omitted).

  i. Dr. Floreani, Dr. Leven, and Weatherford

  It is undisputed that mental illness can qualify as a serious medical need. *Sanville v. McCaughtry*, 266 F.3d 724, 733 (7th Cir. 2001). Deliberate indifference, however, is much harder to establish. A prisoner's dissatisfaction with a medical professional's prescribed course of treatment does not give rise to a successful deliberate indifference claim unless

the treatment is so "blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). "[T]he Eighth Amendment does not reach disputes concerning the exercise of a professional's medical judgment, such as disagreement over whether one course of treatment is preferable to another." *Gaston v. Ghosh*, 11-CV-6612, 2017 WL 5891042, at *11 (N.D. Ill. Nov. 28, 2017) (citing *Cesal v. Moats*, 851 F.3d 714, 721 (7th Cir. 2017)). A prisoner alleging deliberate indifference must provide evidence of an excessive risk to his health that is so intentional or reckless it surpasses even malpractice. *See Gayton v. McCoy*, 593 F.3d 610, 620, 653 (7th Cir. 2010); *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). Therefore, even a mistake in professional judgment does not satisfy this standard. *See Whiting*, 839 F.3d at 662.

I.M. alleges that Dr. Floreani, Dr. Leven, and MHP Weatherford failed to treat I.M.'s mental illness. The record, however, demonstrates otherwise. The evidence provided includes extensive medical records that detail treatment for ADHD, depression, and risk of self-harm including the prescription of multiple medications such as Wellbutrin and Zyprexa, an extended placement on crisis watch with routine check-ins, suicide evaluations when I.M. did not refuse them, and multiple visits attempting to assess and treat I.M. throughout I.M.'s time at Menard. (Doc. 154-6). There is evidence that I.M. met with all three defendants, and that these medical professionals then made treatment decisions based on their observations and experience. (*Id.*) All three indicated that I.M. was hostile and uncooperative, seemed exclusively focused on obtaining I.M.'s medication demands, and continued to evaluate the presence of self-harming behaviors

when making treatment determinations. (*Id.* at pp. 1-77) Prescription decisions were also made in light of these observations. (*Id.* at pp. 41, 42, 54, 65).

As discussed above, all three defendants were entitled to exercise their professional judgment as medical professionals. While there is evidence that I.M. was unsatisfied with the treatment I.M. received, this is insufficient to give rise to an Eighth Amendment claim. *See Snipes*, 95 F.3d at 592. I.M. provides no evidence upon which a jury could conclude that these individuals did not rely on their professional judgment when treating I.M. or that their course of treatment was so egregious as to qualify as intentional mistreatment. Thus, because the Eighth Amendment does not reach issues related to the exercise of professional judgment, there is no support for a deliberate indifference claim against Dr. Floreani, Dr. Leven, or Weatherford.

### ii.    Wexford Health Sources

For I.M. to successfully prove that an organization such as Wexford has been deliberately indifferent to a serious medical need, I.M. must prove that Wexford implemented an unconstitutional policy or practice that resulted in deliberate indifference. *Shields v. Illinois Dep't of Corrs.*, 746 F.3d 782, 789 (7th Cir. 2014). Isolated incidents are not sufficient to establish an unspoken or inferred policy. *Id.* at 796.

I.M. alleges that Wexford has instituted de facto policies and practices that included not treating inmates for mental illness or ADHD, not diagnosing patients with ADHD, and failing to provide doctors who are qualified or willing to diagnose and treat mental illnesses such as ADHD. (Doc. 103, pg. 27). I.M. fails to provide evidence proving these de facto policies exist. In fact, the evidence provided contains extensive medical

records that indicate I.M. was placed on crisis watch for extended periods of time and checked on frequently. (Doc. 154-6). There is also evidence that I.M. was prescribed Wellbutrin to treat I.M.'s ADHD when treated by Wexford doctors. (*Id.* at p. 42) While doctors are allowed to exercise their own professional judgment, there is no evidence to support that Wexford had implemented any type of policy, inferred or otherwise, that prohibited I.M. from receiving treatment for I.M.'s ADHD or I.M.'s other mental illnesses. In fact, the evidence indicates that I.M. met with several Wexford healthcare professionals who treated I.M. even though I.M. was often uncooperative. (Doc. 154-6).

Therefore, the motion for summary judgment as to Count VIII is granted as to all Defendants.

### E.  Count IX – First Amendment Claim for Retaliation Against Dr. Floreani.

To successfully establish a prima facie case of unlawful retaliation under the First Amendment, I.M. must show that (1) "[I.M.] engaged in protected First Amendment activity," (2) that adverse action was taken against I.M. in response, and (3) that the First Amendment protected activity was at least a "motivating factor" behind the retaliatory action. *Holleman v. Zatecky*, 951 F.3d 873, 878 (7th Cir. 2020).

I.M. claims that Dr. Floreani changed I.M.'s medications and diagnosis in unlawful retaliation. (Doc. 103, p. 10). As previously indicated by the Court, the specific activity that I.M. is claiming to be protected under the First Amendment remains unclear. (Doc. 34, p.16). At summary judgment, I.M. still has failed to further address or provide evidence clarifying what activity or speech was protected by the First Amendment and subject to retaliation by Dr. Floreani in this case. (Doc. 154, pp. 14-15). Furthermore, even

if I.M.'s original assertions that Dr. Floreani changed I.M.'s diagnosis and medication in retaliation for I.M.'s suicide attempt on September 19, 2018, or to conceal Dr. Floreani's alleged misdiagnosis were sufficiently specific, neither qualify as protected First Amendment activity. *See Whitfield v. Spiller*, 76 F.4th 698, 708-09 (finding that for speech to be protected it must be consistent with legitimate penological interests, it must not be disruptive or confrontational, it must not undermine the authority of prison official to implement policy and maintain discipline, and it not have a negative effect on prison security or inmate well-being).

Additionally, I.M. has not provided evidence that Dr. Floreani's decision to change I.M.'s medications and diagnosis was an adverse action. An action is sufficiently adverse when it is likely to deter a person of ordinary firmness from continuing to perform protected activity. *Surita v. Hyde*, 665 F.3d 860, 878 (7th Cir. 2011). I.M. has provided no evidence to support the idea that Dr. Floreani's behavior following the incident on September 19, 2018, was designed to prevent I.M. from engaging in protected First Amendment activity in the future.

Finally, I.M. has failed to sufficiently allege that Dr. Floreani was motivated to punish I.M. as a result of I.M.'s attempted suicide. One must determine whether the action was "initiated to punish a prisoner for engaging in protected activity" or simply a "rational, justifiable response" to the prisoner's actions. *Holleman,* 951 F.3d at 879. Further, when making this determination the Court owes deference to the decisions and justifications made by prison officials in an effort to maintain order in a volatile environment. *Id.* at 880. Dr. Floreani's decision to change I.M.'s medications and

diagnosis following an attempted suicide are owed deference, and, in light of I.M.'s failure to provide any evidence alleging the contrary, qualify as a rational and justifiable response to the events on September 19, 2018.

Therefore, Dr. Floreani is granted summary judgment with respect to Count IX.

### F. Count XI – Intentional Infliction of Emotional Distress Claim Against Wexford, Weatherford, Dr. Floreani, Dr. Leven, and VanPelt

Under Illinois law, three elements are necessary to substantiate a claim of intentional infliction of emotional distress ("IIED"): (1) extreme and outrageous conduct by the defendant, (2) either intent to cause distress or knowledge of a high probability that the defendant's own conduct will cause severe emotional distress, and (3) that severe emotional distress actually resulted. *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80 (2003); *see also Dixon v. County of Cook*, 819 F.3d 343, 351 (7th Cir. 2016). To constitute extreme and outrageous conduct, a defendant's actions must be so extreme as to go beyond all possible bounds of decency, which would be regarded as intolerable in a civilized society. *Feltmeier*, 798 N.E.2d at 81 (citing *Kolegas v. Heftel Broadcasting Corp.*, 154 Ill.2d 1, 21, 180 Ill.Dec. 307, 607 N.E.2d 201 (1992)).

I.M. alleges that Wexford, Weatherford, Dr. Floreani, Dr. Leven, and VanPelt exhibited extreme and outrageous behavior but does not provide specific examples, instead relying upon I.M.'s other claims to support this one. (Doc. 103, p. 28). I.M. also failed to elaborate or even respond to the motion for summary judgment on this claim when given the opportunity. (Doc. 159). Further, even viewing the facts that are available in I.M.'s favor, the evidence does not support an IIED claim in this case.

There is no support for the argument that Dr. Leven, Dr. Floreani, Weatherford, and Wexford's treatment of I.M. was extreme and outrageous. In fact, since the Court has determined that I.M. has failed to establish a claim of deliberate indifference against these Defendants, that same behavior cannot be found to be extreme and outrageous. *See Hardy v. Hardy*, 2013 WL 5325077, at *3 (N.D. Ill. Sept. 20, 2013) (stating that the standard for "deliberate indifference" is lower than that of "extreme and outrageous" conduct, and, therefore, a finding that behavior was not deliberately indifferent necessitates a finding that that same behavior was not extreme and outrageous). Thus, a claim of IIED against Dr. Leven, Dr. Floreani, Weatherford, and Wexford that is rooted in the same behavior at issue in I.M.'s deliberate indifference claims cannot survive summary judgment.

Similarly, it has already been established as an uncontroverted fact that VanPelt had no authority to change I.M.'s housing. Therefore, his failure to change I.M.'s housing is also not extreme and outrageous.

Finally, in so much as Dr. Leven may have failed to act appropriately once I.M. complained about the conditions of his cell, this also does not rise to the level of extreme and outrageous behavior. There is nothing in the record to indicate that Dr. Leven exploited this knowledge to intentionally cause I.M. emotional distress. Thus, while the Court has determined that there is still an issue of material fact as to whether Dr. Leven failed to take reasonable measures in relation to I.M.'s complaint as to I.M.'s housing conditions, the Court finds that Dr. Leven is entitled to summary judgment on I.M.'s IIED claim.

For these reasons, the motion for summary judgment on Count XI is granted as to

all parties.

CONCLUSION

As set forth above, the Motion for Summary Judgment filed by Defendants Lee Gregson, Rob Jeffreys, and Anthony Wills (Doc. 148) is **GRANTED.**

The Motion for Summary Judgment filed by Defendants Wexford Health Sources, Inc., Jacob Weatherford, Dr. Christina Floreani, Megan VanPelt, and Dr. Eva Leven (Doc. 53) is **GRANTED** as to Counts II, VI, VIII, IX, and XI and **DENIED** as to Count III.

Defendants Lee Gregson, Rob Jeffreys, Anthony Wills, Wexford Health Sources, Inc., Jacob Weatherford, Dr. Christina Floreani, and Megan VanPelt are **DISMISSED with prejudice**, and the Clerk of Court shall enter judgment in their favor at the conclusion of this case.

The only claim remaining for trial is Count III, an Eighth Amendment claim against Dr. Leven for subjecting I.M. to unconstitutional conditions of confinement while on crisis watch in cell 509 from August 31, 2018, until September 5, 2018, and in cell 503 from September 14, 2018, until October 26, 2018. A telephonic status conference shall be set by separate order to discuss referring this case to mediation and selecting a firm trial date.

IT IS SO ORDERED.

DATED:   September 26, 2023

**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**